1
2
3
4
5
6
7

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DIANE STALLINGS, | No. CIV S-07-1723-CMK |
| Plaintiff, | |
| vs. | <u>MEMORANDUM OPINION AND ORDER</u> |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |
| _____/ | |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the consent of the parties, this case is before the undersigned for final decision on plaintiff's motion for summary judgment (Docs. 12 and 13) and defendant's cross-motion for summary judgment (Doc. 18).

/ / /

/ / /

/ / /

/ / /

1

# I. PROCEDURAL HISTORY

Plaintiff applied for social security benefits on December 19, 2003.  In her application, plaintiff claims that disability began on July 15, 2001.  Plaintiff claims her disability consists of a combination of:  osteoarthritis; carpal tunnel syndrome; Hepatitis B; high blood pressure; back, neck, and shoulder problems; temporomandibular joint ("TMJ") syndrome; and depression.  Plaintiff's claim was initially denied.  Following denial of her request for reconsideration, plaintiff requested an administrative hearing, which was held on July 18, 2006, before Administrative Law Judge ("ALJ") Jean Kingrey.   In her December 22, 2006, decision, the ALJ made the following findings:

1.  The claimant last met the insured status requirements of the Social Security Act on September 30, 2006;

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of July 15, 2001, through her date last insured of September 30, 2006;

3.  Through the date last insured, the claimant had the following severe impairments:  carpal tunnel syndrome and status post release; degenerative disc disease of the cervical and lumbar spines; and asthma;

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

5.  After careful consideration of the entire record, it is found that, through the date last insured, the claimant had the residual functional capacity to perform at least sedentary work; she is able to lift 10 pounds occasionally, less than 10 pounds frequently, and stand, walk, or sit without limitation during an eight hour work day; she can do a job that involves no repetitive over shoulder reaching, no repetitive, quick head turning, no constant, forceful gripping, grasping, or repeated wrist torquing, or prolonged keyboarding, and only occasional crawling or climbing of ropes or scaffolds; she can work in an environment without concentrated exposure to fumes, odors, dusts, and gases;

6.  Through the date last insured, the claimant was unable to perform past relevant work;

7.  The claimant was born July 12, 1958, and was 48 years old on the date last insured and currently, which is defined as a younger individual age 45-49;

/ / /

8. The claimant has at least a high school education and is able to communicate in English;

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills;

10. Through the date last insured and currently, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could perform; and

11. The claimant was not under a "disability," as defined in the Social Security Act, at any time from July 15, 2001, the alleged onset date, through September 30, 2006, the date last insured.

After the Appeals Council declined review on June 30, 2007, this appeal followed.

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains records from the following sources:

1. Physical therapy records covering the period August 2001 through November 2001 from Mt. Shasta Physical Therapy (Ex. 1F; CAR 179-91);

2. Records covering the period September 2001 through November 2001 from Glenn S. O'Sullivan, M.D. (Ex. 2F; CAR 193-211);

3. Report dated November 25, 2002, by Michael A. Sommer, M.D. (Ex. 3F; CAR 214-22);

4. Records covering the period March 2004 through April 2004 from William S. Epstein, M.D. (Ex. 4F; CAR 223-31);[1]

5. Report dated April 16, 2004, by Bradley Daigle, M.D. (Ex. 5F; CAR 232-37);

6. Records covering the period January 2001 through December 2005 from Mercy Medical Center (Exs. 6F, 12F, 13F, and 14F; CAR 240-78, 464-509);

---

[1] Records from Dr. Epstein relate to plaintiff's eyes, which are not at issue in this case.

7.      Physical residual functional capacity assessment dated April 13, 2004, by Sandra Clancey, M.D. (Ex. 9F; CAR 446-53);

8.      Psychiatric review technique form dated May 5, 2004, by F. Mateus, M.D. (Ex. 8F; CAR 426-39);

9.      Functional capacity evaluation with questionnaire, dated April 14, 2005, by Robert Adams, M.D. (Exs. 10F and 11F; CAR 457-63); and

10.     Records covering the period October 2000 through June 2006 from Robert Adams, M.D. (Exs. 7F, 15F, and 16F; CAR 285-425, 511-606).[2]

<u>2001</u>

Records from Mercy Medical Center from January 2001 indicate that plaintiff reported to the emergency room after an episode of acute dizziness and headache.  The emergency room physician referred plaintiff to her treating physician for follow-up care.

Plaintiff sustained a work injury on June 12, 2001.  Following this incident, plaintiff attended physical therapy at Mt. Shasta Physical Therapy.  Therapist Paul Zwetsloot prepared a report for plaintiff's treating physician – Dr. Adams – on August 22, 2001.  In this report. Mr. Zwetsloot provided the following history:

> Patient is a 43-year-old woman with a history of right-sided neck pain following an injury at work as a school janitor on 6/12/01.  She states she felt as if she pulled a muscle while dumping a full garbage can into a dumpster.  She continued to work for 1 month, hoping the symptoms would go away.  She did not have resolution of symptoms, and the symptoms actually began to progress over to her left side.  She now complains of severe muscle spasms in the upper thoracic and cervical regions on the right with some pain in the left as well.
> At the end of July [2001], she sought the assistance of a physician in the ER with complaints of spasms in the neck.  CT scan and x-rays were done with x-ray showing mild degenerative disk disease at C6-7.  CT scan showed mild foraminal narrowing at C5-6 and moderate foraminal narrowing at C6-7 due to uncovertebral osteoarthritis with posterior lateral osetophytes on the right.

///

---

[2]     As discussed below, the ALJ gave "great weight" to Dr. Adams opinions through June 2004, and plaintiff does not contend that the ALJ erred in this regard.  Therefore, Dr. Adams' findings from October 2000 through June 2004 are not at issue, and the court will focus on the doctor's records after June 2004.

Mr. Zwetsloot observed that plaintiff's range of motion in the upper extremity was limited on the right when tested both actively and passively.  Plaintiff's cervical range of motion was severely limited.  Mr. Zwetsloot reported the following functional limitations:

> At this time, patient is no longer working and has been out of work for 1 month because of inability to perform her duties due to pain and limited use of her arms.  She has pain with washing her hair, driving and also getting herself into her truck for which she uses her right hand to pull herself into it.

Contained within records from Dr. Adams is an imaging report by Rebecca L. Dyson, M.D., based on images of plaintiff's thoracic and cervical spines taken on July 25, 2001. As to the cervical spine, Dr. Dyson noted right osteoarthritis causing "mild neural foraminal narrowing at C5-6 and moderate narrowing at C6-7."  As to the thoracic spine, Dr. Dyson noted "[m]ild degenerative disk disease at C6-7, which appears chronic."

On July 29, 2001, plaintiff again reported to the Mercy Medical Center emergency room, this time complaining of neck pain and spasm.  Plaintiff was given an injection of Toradol and a prescription for Robaxin for the spasms.  Plaintiff was stable when discharged and referred to her treating physician for follow-up care.

On September 19, 2001, Dr. O'Sullivan wrote a letter to Dr. Adams outlining his findings and impressions following an examination of plaintiff.  On physical examination, Dr. O'Sullivan noted:

> . . . She does appear to be in distress with primarily neck pain.  She has a normal appearing station and gait and can walk on toes and heels and tandem walk.
>
>           * * *
>
> Head/Neck:  Demonstrates normal cranial neurofunction.  Some restricted range of motion of the cervical spine causing increased neck pain but no obvious radicular complaints.  Tenderness on palpation of the cervical spine, loss of cervical lordosis, no muscle spasm.  Normal thoracic contour without deformity.
>
> Lumbar spine:  Demonstrates loss of lumbar lordosis, posterior incision well healed, restricted range of motion of the lumbosacral spine but no radicular complaints.

> Upper extremities:  Some restricted range of motion of both shoulders with positive impingement sign bilaterally, negative apprehensions test. Good range of motion of elbows and wrists, motor function globally intact, sensation patchy diminished, reflexes diminished, vascular examination normal.

Dr. O'Sullivan recommended MRI and EMG studies, but suggested that physical therapy would be worth attempting.

With records from Dr. O'Sullivan is a report by Kobi Ledor, M.D., of an October 3, 2001, MRI of plaintiff's cervical spine.  Dr. Ledor reported:  (1) slight to mild right foraminal stenosis; and (2) mild C6-7 central spinal stenosis without apparent cord impingement.

Chart notes by Dr. O'Sullivan dated October 24, 2001, indicate that, on physical examination, the doctor noted "some restricted range of motion of the cervical spine with negative Spurling's test."  He also noted that examination of the right shoulder revealed "some diffuse tenderness, positive impingement sign, and restricted range of motion."  Dr. O'Sullivan reported that plaintiff wanted to continue with conservative treatment and the doctor recommended continued physical therapy.  Dr. O'Sullivan also stated:  "We do not find any obvious evidence of neurological compromise with regards to the cervical spine. . . ."

Plaintiff reported to the Mercy Medical Center emergency room again on November 12, 2001, complaining of acute pain symptoms following a physical therapy session earlier in the day.  The emergency room notes indicate the following objective findings:

> The patient has a moderate intention tremor of both upper extremities. She has a very stiff posture.  She is in obvious discomfort.  She has normal strength and sensation in both upper extremities.  She is tender across the entire back with maximal tenderness over the superior border of the right scapula.  And also tenderness at the right rhomboid.  The right posterior neck muscle is also tender to palpation.  The deep tendon reflexes are slightly asymmetric, with a 2+ left biceps jerk and a 1+ right and trace bilateral brachioradialis.

Plaintiff was given Vicodin and advised to follow up with her treating physician.

/ / /

6

1    Dr. O'Sullivan's chart notes from December 12, 2001, reveal that plaintiff

2 presented with persistent symptoms of pain and a flat affect.  Range of motion of the cervical

3 spine was restricted, but Spurling's test was again negative.  Dr. O'Sullivan referred plaintiff to a

4 pain specialist.

5    Dr. Adams' records also contain Dr. Dyson's report of a December 19, 2001,

6 image of plaintiff's thoracic spine.  Dr. Dyson reported mild scoliosis and minimal multilevel

7 degenerative disk disease.  She also noted central end place depressions of "uncertain clinical

8 significance."

9    2002

10    The CAR contains Mercy Medical Center records from a January 30, 2002, right

11 open carpal tunnel decompression surgery by Dr. O'Sullivan.  Plaintiff underwent a left carpal

12 tunnel decompression surgery at Mercy Medical Center on May 22, 2002, again performed by

13 Dr. O'Sullivan.

14    On November 13, 2002, Dr. O'Sullivan reported on a physical examination of

15 plaintiff.  For subjective factors of disability, Dr. O'Sullivan noted:

16       Minimal pain in the neck, thoracic region, and arms at rest becoming
         moderate with increased activities such as lifting weights, repetitive tasks
17       using the upper extremities, overhead repetitive work, and bending or
         twisting activities.
18

19 For objective factors, the doctor noted:

20       Restricted range of motion of the cervical spine and thoracic spine; diffuse
         tenderness; evidence of osteoporosis and scoliosis; no evidence of
21       significant neurological compromise on clinical examination; nerve
         conduction studies confirming carpal tunnel release; positive Tinel sign;
22       patchy sensory changes in the median nerve distribution of both hands;
         restricted range of motion of both wrists and mild tenderness.
23

24 Dr. O'Sullivan added:

25       It is possible that she may need to be re-evaluated for flare-ups of
         symptoms requiring the use of physical therapy for the cervical, thoracic,
26       and upper extremities.  It is possible that she may require injections of the

7

cervical spine, thoracic spine, and possibly her shoulders.  Consideration
should be made for evaluation and treatment by a pain management
specialist.

On November 25, 2002, Dr. Sommer reported on his November 7, 2002,
evaluation of plaintiff incident to her Workers' Compensation claim.  Regarding subjective
complaints, Dr. Sommer reported:

> Ms. Stallings has completed a pain drawing on which there is a fairly
> extensive amount of symbols over the posterior beck, anterosuperior and
> posterosuperior shoulders symmetrically, interscapular region and
> parascapular areas rather symmetrically and extending then distally down
> the bilateral arms to the wrists.  She says that her symptoms are pretty
> symmetric between the right and the left side and she cannot really decide
> whether she has more pain in the neck or more pain in between her
> shoulder blades and into the upper limbs.  She says that sometimes it is
> one worse than the other.

> She indicated that she is not really comfortably able to lift more than about
> five pounds, says she cannot do any grocery shopping, carry any
> purchases, or do any housecleaning, and she is really quite restricted.  She
> indicates her tolerance to sit, stand, drive, and lift is very much less than
> before this injury happened.

> It is Ms. Stallings' report that virtually any type of physical activity with
> her upper extremities provokes significant intensifying pain.

On physical examination, Dr. Sommer noted:

> Diane Stallings is a pleasant woman, articulate in her presentation and
> absent pain behavior.  She has some postural findings, including a bit of an
> accentuated lumbar lordosis and she quite obviously guards cervical spine
> movement (in other words, turns the upper torso with the head).  This
> seems legitimate and not a pain behavior exaggerated display.

Dr. Sommer noted left forearm atrophy as a result of the injury.  He noted a disparity between
right and left hand grip strength and opined:  "I am not sure that Ms. Stallings made a full effort
on the right, . . . while the effort does seem full and the readings valid on the left."  He estimated
a 30% grip weakness on the left.  He observed that cervical spine movement was "universally
down by half, except in extension which is down by two thirds."  Plaintiff exhibited tenderness to
palpation of the neck.  Phalen's maneuver was negative bilaterally, although plaintiff
demonstrated "mildly positive Tinel's signs at the ulnar nerve at the medial elbows

symmetrically." Dr. Sommer concluded that plaintiff "is at a permanent and stationary plateau from the 6/12/01 injury on the present 11/7/02 evaluation date." As to objective factors of disability, the doctor stated:

> Objective factors of disability are pain and limitations of cervical spine movement; legitimate guarding of cervical spine motions; some diminution of touch and pin in the ulnar digits of the hand; the patient's status now following bilateral carpal tunnel release surgery; atrophy of the left forearm and weakness of grip on the left major side, as well as Tinel's findings over the ulnar nerve at the medial elbow symmetrically; tenderness in the cervical spine and mid thoracic segments, as well as over the superior medial scapular angles bilaterally and cervical spinous processes.

Dr. Sommer concluded that plaintiff is precluded from repetitive movements and heavy lifting. He also stated that she should avoid repetitive and forceful pushing and/or pulling with the upper extremities.

### 2003

The CAR reflects that plaintiff reported to Mercy Medical Center in 2003 with complaints of a possible ankle injury. Plaintiff was diagnosed with an ankle sprain and provided pain medication and splints.

### 2004

On March 25, 2004, Dr. Adams submitted a letter to the agency regarding plaintiff's functional capacity. Dr. Adams stated:

> This letter is in regard to Ms. Stallings' alleged impairment. She does suffer from degenerative disc disease of the cervical and lumbar spine, which causes chronic neck and low-back pain. She also was recently diagnosed with chronic hepatitis B infection for which she is asymptomatic. She also suffers from hypertension which is well controlled with medication. She also has intermittent temporomandibular joint syndrome on the left side, which is currently asymptomatic. She also suffers from mild depression.
>
> Physical activities should include sitting and standing in position of comfort through an 8-hour day. There should be no limitations with walking, lifting is limited to 10 pounds, and carrying to 5 to 10 pounds. She states she drops objects regularly. There should be no problems with hearing, speaking, or traveling. There should be no mental imitations.

9

1  Dr. Adams enclosed his chart notes to date with this letter.

2        On April 13, 2004, agency consultative doctor Sandra Clancey completed a

3  physical residual functional capacity assessment.  Dr. Clancey concluded that plaintiff could lift

4  up to 20 pounds occasionally and up to ten pounds frequently.  She also concluded that plaintiff

5  could sit, stand, and/or walk for about six hours in an eight-hour day and that plaintiff was

6  unlimited in her ability to push and/or pull.  Plaintiff was limited to only occasional climbing of

7  ropes and ladders and crawling.  Otherwise, Dr. Clancey did not note any postural limitations.

8  She did, however, feel that plaintiff was limited in her manipulative ability to reach, handle, and

9  finger.  Dr. Clancey did not note any visual or communicative limitations.  As to environmental

10  limitations, Dr. Clancey opined that plaintiff should avoid concentrated exposure to fumes,

11  odors, dusts, and gases.

12        On April 16, 2004, agency psychiatrist Bradley Daigle performed a complete

13  psychiatric evaluation of plaintiff.  Plaintiff reported to Dr. Daigle that her chief complaint was

14  osteoarthritis.  Regarding her 2001 injury, plaintiff told Dr. Daigle that her Workers'

15  Compensation claim was settled with a 41% physical disability rating.  Dr. Daigle noted the

16  following psychological history:

17        Psychologically, Ms. Stallings has an essentially negative history, although
   she states that she became somewhat depressed in approximately 2001
18        "when I realized I was not going to get much better."  She states that she
   occasionally cries a lot, but there has been no suicidal ideation at any point
19        and she has never been psychiatrically hospitalized.  She has also never
   seen a psychiatrist, psychologist, or other mental worker, but her primary
20        care physician has been treating her with antidepressants for at least a
   couple of years, initially Zoloft and now Lexapro.  She states that the
21        Lexapro, 30 mg a day, is helpful.  She also takes a small dose of Elavil for
   sleep, which is restless.  She denies any hallucinatory experience or other
22        psychiatric disturbances and she is not abusing drugs or alcohol.  She
   reports some distractibility and memory problems.
23

24  Plaintiff reported to Dr. Daigle that she has not worked since her injury in 2001.  On mental

25  status examination, Dr. Daigle  observed that plaintiff's thought processes were coherent and

26  organized, with no tangentiality or loosening of associations.  As to intellectual functioning, Dr.

Daigle opined that plaintiff "appears to be of at least average intelligence." The doctor did not observe any memory deficits. Dr. Daigle diagnosed plaintiff with adjustment disorder and mild, treated depressed mood. He assigned a global assessment of functioning ("GAF") score of 70 on a 100-point scale. With respect to plaintiff's mental functional capabilities, Dr. Daigle opined that plaintiff was:

1. Not significantly limited in ability to understand, remember, and carry out simple instructions;

2. Not significantly limited in ability to follow detailed and complex instructions;

3. Not significantly limited in ability to relate and interact with others;

4. Slightly limited in ability to maintain concentration, attention, persistence, and pace;

5. Not significantly limited in ability to associate with day-to-day work activities, including attention to safety; and

6. Slightly limited in ability to adapt to the stresses common to a normal work environment.

On May 5, 2004, agency consultative doctor F. Mateus prepared a psychiatric review technique form. The doctor reiterated Dr. Daigle's diagnosis of adjustment disorder with mild depressed mood and concluded that plaintiff had an affective disorder which was not severe. The doctor opined that plaintiff was mildly limited in her activities of daily living and ability to maintain social functioning, concentration, persistence, and pace.

On May 6, 2004, plaintiff underwent right eye cataract removal surgery at Mercy Medical Center, performed by Dr. Epstein.

On June 17, 2004, Dr. Adams submitted another letter to the agency regarding plaintiff's functional capacity. In this letter, Dr. Adams outlined plaintiff's various ailments and stated that her physical limitations are unchanged, referencing his previous letter to the agency.

/ / /

/ / /

The CAR contains treatment notes from Dr. Adams for various dates from June through December 2004, as summarized below:

| | |
|---|---|
| 6-17-2004 | Plaintiff complained of abdominal pain; no musculoskeletal observations made. |
| 7-1-2004 | Plaintiff complained of an eye injury; no musculoskeletal observations made. |
| 7-16-2004 | Plaintiff complained of chronic upper back and neck pain; on physical examination, Dr. Adams noted "diffuse musculoskeletal tenderness. . . ." |

On August 11, 2004, plaintiff underwent left eye cataract removal surgery at Mercy Medical Center, again performed by Dr. Epstein.

Additional treatment notes from Dr. Adams for the remainder of 2004 are summarized as follows:

| | |
|---|---|
| 8-13-2004 | Plaintiff reported to refill medications; on physical examination, Dr. Adams noted that "Back is as before." |
| 9-9-2004 | Plaintiff followed up for low back pain and lower extremity weakness; Dr. Adams noted that plaintiff sat on the examination table in apparent discomfort; he also noted tenderness in the paralumbar region as well as "nonspecific decreased sensation in the lower extremities"; Dr. Adams discussed treatment options such as epidural injections, chiropractic care, and/or physical therapy, all of which plaintiff refused. |
| 11-29-2004 | Dr. Adams observed "diffuse tenderness to neck and back." |
| 12-23-2004 | Dr. Adams noted that plaintiff was attempting to obtain early refills on medications; he also noted that, while plaintiff had agreed to use other pain management modalities, she had failed to do so; Dr. Adams suggested that plaintiff "try to do something besides take pills to alleviate her neck pain." |

2005

January and February 2005 notes by Dr. Adams are summarized as follows:

| | |
|---|---|
| 1-14-2005 | Plaintiff complained of low back pain; for objective findings, Dr. Adams noted "Alert female in [no acute distress];" the doctor also noted recent MRI findings of moderate left foraminal stenosis at L3-4 due to a disk bulge, and posterior disk bulge at L4-5 without definite nerve root impingement. |

| | | |
|---|---|---|
| 1 | 1-26-2005 | Plaintiff complained of a cough, chest congestion, and feeling feverish; on physical examination, Dr. Adams noted that plaintiff's neck was supple with no adenopathy. |
| 2 | | |
| 3 | 2-23-2005 | Plaintiff sought refills of her medications; Dr. Adams noted no change in her chronic pain condition, which was being treated by Dr. Sowerby with intrathecal injections; Dr. Adams stated that plaintiff would "move to physical therapy once she is feeling a little bit better, which should be soon." |
| 4 | | |
| 5 | | |

On March 19, 2005, plaintiff was admitted to Mercy Medical Center for overnight observation in the intensive care unit after "developing altered mental status and bizarre behavior earlier in the day." A toxicology screen was positive for THC, opiates, and benzodiazepines. Plaintiff's altered mental status had cleared by the next morning. Plaintiff was referred to Dr. Adams for follow-up care.

Treatment notes by Dr. Adams on March 24, 2005, reveal that plaintiff had an "adverse reaction after accidentally taking an extra dose of Baclofen" while using marijuana. Plaintiff admitted to Dr. Adams that she used marijuana on a regular basis. Regarding her back and neck pain, plaintiff asked Dr. Adams for a functional capacity evaluation for her disability case. On physical examination, Dr. Adams noted only "diffuse tenderness in the paraspinal cervical muscles and paralumbar region."

On April 14, 2005, Dr. Adams completed a physical residual functional capacity questionnaire and physician's evaluation. Even though the CAR contains treatment notes completed by Dr. Adams as early as 2000, he states in this evaluation that he has treated plaintiff since 2001. The doctor indicates a diagnosis of cervical and lumbar degenerative disc disease, pain syndrome, and depression. He states that plaintiff's symptoms include headaches, neck pain, muscle spasms, arm numbness, and fatigue. Dr. Adams states that depression and anxiety contribute to the severity of plaintiff's symptoms and functional limitation. Dr. Adams opined that plaintiff has the following functional limitations:

    1.    Pain frequently interferes with plaintiff's ability to concentrate even on simple tasks;

2.      Plaintiff is capable of low stress jobs, but only "if able to sit or stand or lie down";

3.      Plaintiff is able to do "sit down work" for only one-hour periods of time;

4.      Plaintiff can walk without rest for two to three city blocks;

5.      Plaintiff can only sit for up to 30 minutes at a time;

6.      Plaintiff can only stand for up to ten minutes at a time;

7.      Plaintiff cannot sit/stand/walk for more than a total of two hours in an eight-hour day;

8.      Plaintiff must take breaks from sitting every 30 minutes during which she walks for five minutes;

9.      Plaintiff can only perform jobs that permit shifting position at will;

10.     Plaintiff will need to take unscheduled 30-minutes breaks from time to time;

11.     Plaintiff can only rarely lift up to ten pounds, and never more than that;

12.     Plaintiff can only occasionally look down or hold her head in a static position, and only rarely turn her head or look up;

13.     Plaintiff can only rarely twist, stoop, crouch, or climb ladders, and only occasionally climb stairs;

14.     Plaintiff has significant limitations with reaching, handling, and fingering;

15.     Plaintiff is likely to be absent from work about four days per month due to her impairments and/or treatment; and

16.     Plaintiff is likely to have eight painful episodes per month likely to cause her to be absent from work.

Dr. Adams opined these limitations are permanent.  No objective findings are noted or referenced in this evaluation.

The CAR contains additional treatment notes from Dr. Adams for 2005:

4-22-2005    Plaintiff was following-up on her chronic pain; on physical examination, Dr. Adams again noted "diffuse tenderness in the cervical and lumbar region."

/ / /

/ / /

14

| | | |
|---|---|---|
| 5-18-2005 | Plaintiff reported for a "well woman check" and a new back injury caused when she twisted attempting to avoid stepping on her cat; on physical examination, Dr. Adams noted only the following related to plaintiff's back: "MUSCULOSKELETAL:  Strength is 5/5." |
| 6-16-2005 | Plaintiff sought medical refills; on physical examination, Dr. Adams observed diffuse musculoskeletal tenderness in the paraspinal lumbar region over the hips; straight leg raise was negative, and heel and toe walking were intact. |
| 6-27-2005 | Plaintiff complained of dental pain; TMJ syndrome was diagnosed. |
| 7-5-2005 | Phone note indicating that plaintiff's son had drowned over the weekend; Dr. Adams recommended therapy and grief counseling. |
| 7-14-2005 | Following the death of her son, plaintiff was prescribed Ativan, which helped "calm her nerves"; on physical examination, Dr. Adams noted:  "The patient has diffuse tenderness in the cervical region, upper thoracic region, and lumbar region per her usual exam." |
| 9-8-2005 | Plaintiff reported her pain is "about the same" and that it "comes and goes"; Dr. Adams observed "diffuse tenderness in the neck, shoulders, and low back." |
| 10-25-2005 | Discussion of epidural injections and/or physical therapy for pain management, but plaintiff declined such treatment and opted to continue with her medication. |
| 11-4-2005 | Plaintiff reported for pain and a medication refill; on physical examination, Dr. Adams noted "generalized tenderness in the paracervical region, but no obvious trauma or erythema"; Dr. Adams also noted a full range of motion and no motor deficits in plaintiff's upper extremities. |
| 12-1-2005 | Plaintiff complained of an "exacerbation" of her pain symptoms; on physical examination, Dr. Adams reported "No obvious changes in the musculoskeletal aspect of her shoulder." |

On December 27, 2005, plaintiff reported to the Mercy Medical Center emergency room following a motor vehicle accident.  She was diagnosed with acute cervical and lumbar strain and was advised to see Dr. Adams for follow-up treatment.  Plaintiff was seen by Dr. Adams on December 29, 2005, but no physical examination was performed at that time.  There is no further mention of the December 2005 car accident in Dr. Adams' records.

/ / /

15

1          2006

2          The record contains Dr. Adams' treatment notes for various dates in early 2006.

3   These are summarized as follows:

4          1-26-2006      Plaintiff complained of ongoing severe pain; tenderness in the
                          paraspinal cervical muscles, upper thoracic region, and low back
5                         was noted.

6          2-16-2006      Plaintiff complained of chronic neck pain; no examination.

7          3-15-2006      Follow-up for hypertension, depression, and chronic neck pain;
                          mild diffuse tenderness in the paraspinal cervical muscles; plaintiff
8                         declined refills of prescription medications "due to cost."

9          3-27-2006      Plaintiff complained of headaches and increasing blood pressure;
                          she stated she had been without blood pressure medication for over
10                        two weeks; on physical examination, Dr. Adams noted:
                          "MUSCULOSKELETAL:  Full range of motion" and "Strength is
11                        5/5."

12         3-29-2006      Plaintiff complained of increase in low back pain caused by
                          running out of pain medication; on physical examination,
13                        plaintiff's paralumbar region was tender, but straight leg raise was
                          negative and heel and to walking were intact; discussed referral to
14                        physical therapy and chiropractor.

15         4-4-2006       Plaintiff complained of chronic neck pain and requested a refill of
                          medications; no acute distress noted; diffuse musculoskeletal
16                        tenderness noted on physical examination.

17         On April 12, 2006, Dr. Adams wrote a letter regarding plaintiff's functional

18  capabilities.  He stated:

19                This letter is in regard to Ms. Diane Stallings' alleged impairment.  She
                  does suffer from lumbar degenerative disk disease, as well as cervical
20                degenerative disk disease, and she has chronic problems with myofascial
                  pain in her upper and midback.  She also has hypertension and chronic
21                anxiety disorder, as well as depression.

22                She is limited in her physical activities to working one to two hours per
                  day and is limited in lifting to 20 pounds, 10 pounds continuously,  She
23                should be able to sit and stand in a position of comfort throughout the day
                  and walk short distances.

24

25  Dr. Adams enclosed his chart notes covering the period from June 17, 2004, through April 4,

26  2006, with this letter.

16

Dr. Adams saw plaintiff again in May and June 2006.  His treatment notes are summarized as follows:

5-4-2006     Plaintiff complained of chronic neck pain; Dr. Adams reported that this is a "major problem and basically unchanged"; plaintiff stated that it felt like her right hip had become dislocated; on physical examination, Dr. Adams noted:  "The right hip appears to be nontender, good range of motion, no pain, no obvious looseness, etc."

5-22-2006     Plaintiff sought a refill of medications and a follow-up on her right hip pain; Dr. Adams noted tenderness to palpation and ordered a right hip x-ray; he opined that plaintiff had right hip myalgia, possibly secondary to osteoarthritis.

6-1-2006     Plaintiff followed-up on pain control; on physical examination, plaintiff's neck was supple with a full range of motion and no abnormalities; there was tenderness to palpation of the extremities; Dr. Adams reminded plaintiff to get the hip x-ray done.

The CAR does not contain any further treatment noted from Dr. Adams.

## III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the

17

1  Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

2  Therefore, where the evidence is susceptible to more than one rational interpretation, one of

3  which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

4  Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

5  standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

6  Cir. 1988).

7

8                               **IV.  DISCUSSION**

9              In her motion for summary judgment, plaintiff argues:  (1) the ALJ improperly

10  rejected the most recent opinions and ultimate conclusions of her treating physician, Dr. Adams;

11  (2) the ALJ erred by failing to recontact Dr. Adams to fully develop the record; (3) the ALJ

12  improperly substituted her opinions for those of Dr. Adams; (4) the ALJ erred in rejecting

13  plaintiff's testimony as not credible; and (5) the ALJ erred by relying on the vocational expert's

14  answers to hypothetical questions that did not accurately reflect plaintiff's residual functional

15  capacity and by rejecting the expert's answers to questions that did.  Plaintiff discusses the first

16  three arguments concerning the ALJ's assessment of Dr. Adams' opinions together, and

17  discusses the four and fifth arguments separately.

18              The court notes that, at page 18 of her motion for summary judgment, plaintiff

19  also argues that the ALJ erred with respect to her analysis of Dr. O'Sullivan's opinion concerning

20  limitations associated with plaintiff's carpal tunnel syndrome.  Her argument, in its entirety, is as

21  follows:

22                    The ALJ also erred to the extent that she questioned Dr.
                 O'Sullivan's opinion in November  2002, concerning the disabilities in
23               lifting, engaging in repetitive activities with the upper extremities and
                 grasping or gripping activities, stating that they were made "shortly after
24               her carpal tunnel release and **may** no longer be appropriate." (Tr. 29,
                 ALJ's Decision, p. 7).  Dr. O'Sullivan contradicted the ALJ's inference by
25               specifically stating that Plaintiff was **medically stationary** from her carpal
                 tunnel syndrome at that time. (Ex. 2F/3; see ALJ's Decision page 7).
26               (emphasis in original).

                                          18

1    The court finds, however, that there can be no viable argument as to the ALJ's consideration of

2    Dr. O'Sullivan's opinions because the ALJ accepted his opinions and included his limitations in

3    her residual functional capacity assessment.   The ALJ's observation that Dr. O'Sullivan's

4    assessment was made shortly after successful carpal tunnel release surgery is irrelevant.

5    Therefore, the only medical opinions at issue in this case are those of Dr. Adams.

6            The court also notes that, while plaintiff apparently contends that her depression

7    and anxiety are severe impairments, she does not raise any specific arguments concerning these

8    problems.  Nor could she.  The record is clear that plaintiff's depression and anxiety were not

9    severe and were well controlled.  Examining agency psychiatrist Dr. Daigle concluded that

10   plaintiff's depression was mild, and the agency consultative psychiatrist agreed.  Dr. Adams also

11   characterized plaintiff's depression as mild.  Plaintiff's mental problems were consistently

12   managed by Dr. Adams with medication  and there is no evidence that plaintiff ever sought care

13   from a mental health specialist, even after Dr. Adams' recommended that she do so following her

14   son's death in 2005.

15           The court also notes that plaintiff does not raise any arguments concerning her

16   Hepatitis B.  Again, the record does not support a finding that this condition resulted in any

17   functional limitations.  In March 2004, Dr. Adams noted that plaintiff was asymptomatic with

18   respect to Hepatitis B.

19           For these reasons, the court's discussion focuses on the ALJ's analysis of

20   plaintiff's physical impairments related to her neck and back as a result of the 2001 work injury.

21   **A.    Dr. Adams' Opinions**

22           Plaintiff raises three arguments concerning the ALJ's evaluation of Dr. Adams'

23   opinions.  First, she argues that the ALJ erred in rejecting the doctor's opinions without giving

24   sufficient reasons for doing so.  Second, plaintiff argues that the ALJ failed to develop the record

25   by recontacting Dr. Adams.  And third, she argues that the ALJ improperly substituted her own

26   medical opinions and conclusions for those of Dr. Adams.

1              1.     Evaluation of Dr. Adams' Opinions

2              The weight given to medical opinions depends in part on whether they are

3    proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

4    821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

5    professional, who has a greater opportunity to know and observe the patient as an individual,

6    than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

7    (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

8    to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

9    (9th Cir. 1990).

10             In addition to considering its source, to evaluate whether the Commissioner

11   properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

12   in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

13   uncontradicted opinion of a treating or examining medical professional only for "clear and

14   convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

15   While a treating professional's opinion generally is accorded superior weight, if it is contradicted

16   by an examining professional's opinion which is supported by different independent clinical

17   findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

18   1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

19   rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

20   81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

21   the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

22   finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

23   legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

24   professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

25   without other evidence, is insufficient to reject the opinion of a treating or examining

26   professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

1    conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

2    1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

3    see also Magallanes, 881 F.2d at 751.

4              According to plaintiff, the ALJ improperly rejected the following opinions by Dr.

5    Adams:

6              1.    Plaintiff was limited to working one to two hours a day;

7              2.    Plaintiff needed an opportunity to lie down during the day to relieve pain;

8              3.    Plaintiff's stamina for work activity decreased as the day progressed; and

9              4.    Plaintiff's episodes of pain would cause unpredictable absenteeism or the
                     need to withdraw from work activities approximately eight times a month.

10

11   As mentioned above, plaintiff does argue that the ALJ erred in analyzing Dr. Adams' opinions

12   regarding plaintiff's depression and anxiety.  Her arguments are limited to Dr. Adams opinions as

13   to plaintiff's physical limitations.

14             The ALJ discussed Dr. Adams' opinions in great detail, dividing them between

15   "earlier treating source opinions" and "two most recent opinions [from April 2005 and April

16   2006]."  As to the "earlier treating source opinions," which the ALJ gave "great weight," the ALJ

17   stated:

18             Robert Adams, M.D., the claimant's primary care provider, submitted
               multiple medical source statements.  He initially expected that the
19             claimant would be able to return to work within a few months following
               her work injury (7F/118).  He noted in August 2001:  "[s]he has had less in
20             the way of spasms and less discomfort in her neck, and I believe she is
               making good progress.  Her x-rays show minimal disc disease and I think
21             that if she has some lifting restrictions she will do fine from here on out
               . . . return to regular duty [in two weeks]." (7F/117).  He even planned to
22             discontinue her pain medications in the very near future.  Dr. Adams
               released the claimant to light duty work in late August 2001 with
23             limitations of lifting a maximum 20 pounds, limited overhead work, and
               limited repetitive work with her right hand to four hours per shirt (7F/115).
24             In September 2001 he added that the claimant should take a ten minute
               stretch break for every hour of work (7F/112).
25

26   / / /

21

In December 2001, Dr. Adams wrote a letter regarding the claimant's Workers' Compensation claim in which he stated:

> I believe that her original neck injury has now healed.  She has multiple musculoskeletal complaints. . . .  Close review of her situation, however, has shown that the associated symptoms and discomfort of the original neck injury are now resolved.  I think we can close her claim regarding her neck injury at the present time.  This in and of itself should not be a limiting factor.

(7F/98).

Dr. Adams submitted a medical source statement to the state agency in January 2004 (7F/32).  He opined that the claimant was limited to lifting no more than 25 pounds and limited to repetitive lifting of no more than 10 pounds.  He wrote that the claimant "should be able to sit and stand in a position of comfort through an eight-hour day," although she complains of neck pain with sitting at the computer.  Finally, Dr. Adams indicated that the claimant has no mental impairments of which he is aware.

Dr. Adams submitted additional opinions to the state agency in March and June 2004 (7F/18; 7F/7).  These opinions were largely the same, although he noted that the claimant was not limited with respect to walking, and that her lifting was limited to a maximum of 10 pounds and carrying five to 10 pounds since she drops objects regularly by her own report.

Regarding Dr. Adams' April 2005 and April 2006 opinions, the ALJ stated:

> In April 2005, Dr. Adams completed a physical residual functional capacity questionnaire at the request of the claimant's attorney (10F/1-5; 11F/1-2).  This time, contrary to numerous previous opinions, he indicated that the claimant had depression and anxiety that contributed to her functional limitations, as well as that her pain would interfere with her attention and concentration, and that she was capable of only low stress jobs (10F/1-2).

> Physically, he indicated that the claimant would need to alternate between sitting and standing at will for comfort, although she needs to lie down every two hours (10F/3; 11F/1).  He felt she could stand for 10 minutes at a time, walk two to three blocks, and sit for 30 minutes at a time, although he noted that she could do "sit down work" for one hour periods and stand or walk for a total of about two hours (10F/2-3; 15F/48).  Dr. Adams felt the claimant could lift up to 10 pounds occasionally (10F/4; 11F/1).  He added additional limitations in that the claimant should only occasionally look down, hold her head in a static position, or climb stairs, that she should rarely turn her head right or left, look up, twist, stoop, crouch, squat, or climb ladders, and that she has significant manipulative limitations (10F/4-5).  He estimated that the claimant would need to take unscheduled breaks every two hours, and that she would be unpredictably absent from work about four days per month (10F/3; 11F/2).

Finally, in April 2006 Dr. Adams indicated that the claimant was limited to lifting 20 pounds occasionally and 10 pounds frequently, and that she "should be able to sit and stand in a position of comfort throughout the day and walk short distances" (15F/2). He went on to state that the claimant is limited to working one to two hours per day.

As to the April 2005 and April 2006 opinions, the ALJ gave them no weight. Specifically, the ALJ stated:

> . . . [H]is two most recent opinions are drastically more limiting than the numerous opinions he issued previously. I note that the April 2005 opinion was submitted at the behest of the claimant's attorney, and apparently completed largely based upon the claimant's subjective self-report; Dr. Adams' chart notes indicate "[w]e went over the functional capacity questionnaire and answered each question" (15F/48). These opinions do not accurately reflect the medical record, which shows continued improvement rather than deterioration of the claimant's condition. I therefore give his April 2005 and April 2006 opinions no weight as they are reflective of claimant's noncredible self report and are not supported by his treatment records or the record as a whole. They are also contrary to his own opinion of record.

Plaintiff argues the ALJ erred in accepting the earlier opinions over the more recent opinions. She cites Young v. Heckler, 803 F.2d 963, 968 (9th Cir. 1986), for the proposition that the most recent medical opinions are more probative where there is evidence the claimant's medical condition is deteriorating. Young, however, is not applicable because the record does not suggest that plaintiff's condition worsened. A review of Dr. Adams' treatment notes throughout 2005 and 2006 suggests that plaintiff's condition, at worst, remained the same and, at best, improved.

The following treatment notes suggest that plaintiff's condition improved:

1.  On January 26, 2005, plaintiff complained of a cough and stated she felt feverish. See Ex. 15F; CAR 565. Dr. Adams noted on physical examination that plaintiff's neck was supple with no adenopathy. See id.

2.  On May 18, 2005, plaintiff reported for a "well woman check" and a recent back injury. See Ex. 15F; CAR 550-51. On physical examination, Dr. Adams noted the following regarding plaintiff's back: "MUSCULOSKELETAL: Strength is 5/5." See id. at 551.

3.  On November 4, 2005, Dr. Adams noted a full range of motion and no motor deficits in plaintiff's upper extremities. See id. at 529.

4.      On March 27, 2006, plaintiff complained of symptoms related to hypertension.  <u>See</u> Ex. 15F; CAR 515.  On physical examination, Dr. Adams noted a full range of motion on musculoskeletal examination.  <u>See id.</u>

5.      On June 1, 2006, Dr. Adams noted a full range of motion on examination of plaintiff's neck.  <u>See</u> Ex 16F; CAR 594.

In each of these treatment notes, Dr. Adams noted normal objective findings, suggesting that whatever organic factors causing plaintiff's chronic pain had resolved.[3]

Turning to those treatment notes which do reflect objective findings relating to plaintiff's complaints of chronic pain symptoms, Dr. Adams consistently noted nothing more than diffuse tenderness in the cervical and/or lumbar regions.  Further, this observation remained the same over time, as reflected by treatment notes throughout 2004, 2005, and 2006.  Therefore, to the extent plaintiff's condition did not improve, as reflected in the treatment notes discussed above, at worst her condition remained static.[4]   The conclusion that plaintiff's condition either remained static or improved is supported by evidence, discussed in more detail below in the context of plaintiff's credibility, that plaintiff continually refused more aggressive treatment, preferring instead to manage her pain with medication (and, for a short time in 2001, a TENS unit and physical therapy).

/ / /

/ / /

_____

[3]      It is interesting that no objective abnormalities were noted with respect to plaintiff's musculoskeletal pain when she presented for unrelated problems in January 2005, May 2005, and March 2006.  It seems that Dr. Adams only noted objective findings when plaintiff specifically complained of musculoskeletal pain symptoms.

[4]      Plaintiff's condition did not seem to be affected by her car accident in December 2005.  Plaintiff was seen by Dr. Adams shortly after the accident at which time plaintiff was concerned that the accident had exacerbated her chronic neck and back problems.  However, no physical examination was performed at this visit and there is no further reference to the accident in any of Dr. Adams' other treatment notes, which consistently documented essentially unchanging objective findings.

1          Given that plaintiff's condition either remained static or improved over time, the

2   ALJ's rejection of the April 2005 and April 2006 assessments as inconsistent generally with the

3   record as a whole and specifically with Dr. Adams' earlier opinions are supported by substantial

4   evidence.   In addition to these inconsistencies, the April 2005 assessment is internally

5   inconsistent.  Dr. Adams stated that plaintiff can do "sit down work" for one-hour periods of

6   time, see Ex. 10F; CAR 458, but also opined that plaintiff cannot sit for more than 30 minutes at

7   a time and must take walking breaks every 30 minutes, see id. at 458-59.  The doctor stated that

8   plaintiff cannot stand for more than ten minutes at a time, see id. at 459, but also stated that she

9   can walk up to three city blocks without rest, see id. at 458.  Dr. Adams stated that plaintiff's

10   impairments and/or treatment would cause her to be absent from work for up to four days per

11   month, see id. at 461, but also stated that her pain symptoms would cause up to eight days of

12   absences, see Ex. 11F; CAR 463.

13          Not only is the April 2005 assessment internally inconsistent, it is inconsistent

14   with the April 2006 assessment.  In the April 2006 evaluation, Dr. Adams stated that plaintiff

15   could lift up to 20 pounds, see Ex. 15F; CAR 511, but opined in the April 2005 evaluation that

16   plaintiff could never lift more than ten pounds, see Exs. 10F and 11F; CAR 460, 462.  In the

17   April 2006 evaluation, Dr. Adams stated that plaintiff was able to "sit and stand in a position of

18   comfort throughout the day," see Ex. 15F; CAR 511, but stated in the April 2005 evaluation that

19   plaintiff could not sit for more than 30 minutes (or one hour, depending on which opinion from

20   the 2005 evaluation is considered), and that plaintiff could not stand for more than ten minutes,

21   see Ex. 10F; CAR 459.

22          The ALJ accepted Dr. Adams' earlier opinions (i.e., his opinions through June

23   2004), and plaintiff does not argue that she erred in doing so or that Dr. Adam's earlier opinions

24   do not correctly reflect her condition.  The basis of plaintiff's argument is that her condition

25   worsened over time, as reflected in Dr. Adams' April 2005 and April 2006 opinions of a much

26   more limited functional capacity.  However, as discussed above, plaintiff's condition either

1    remained the same over time or improved.  Thus, the April 2005 and April 2006 assessments are

2    inconsistent with the record and Dr. Adams' own treatment notes.  Moreover, the April 2005

3    evaluation is internally inconsistent in addition to being inconsistent with the 2006 evaluation.

4    For all these reasons, the court finds that the ALJ properly accepted Dr. Adams' earlier opinions

5    and rejected the April 2005 and April 2006 opinions.

6                      2.    Recontacting Dr. Adams

7                The ALJ has an independent duty to fully and fairly develop the record and assure

8    that the claimant's interests are considered.  See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th

9    Cir. 2001).  When the claimant is not represented by counsel, this duty requires the ALJ to be

10   especially diligent in seeking all relevant facts.  See id.  This requires the ALJ to "scrupulously

11   and conscientiously probe into, inquire of, and explore for all the relevant facts."  Cox v.

12   Califano, 587 F.2d 988, 991 (9th Cir. 1978).   Ambiguous evidence or the ALJ's own finding that

13   the record is inadequate triggers this duty.  See Tonapetyan, 242 F.3d at 1150.  The ALJ may

14   discharge the duty to develop the record by subpoenaing the claimant's physicians, submitting

15   questions to the claimant's physicians, continuing the hearing, or keeping the record open after

16   the hearing to allow for supplementation of the record.  See id. (citing Tidwell v. Apfel, 161 F.3d

17   599, 602 (9th Cir. 1998)).

18               While plaintiff states in her summary of arguments on page 5 of her brief and in

19   her heading on page 14 that the ALJ erred in failing to recontact Dr. Adams, she offers no

20   specific points and authorities in support of this assertion.  In any event, the court finds no error

21   in this regard.  The duty to develop the record by recontacting a treating source only arises when

22   the evidence is either ambiguous or inadequate.  In this case, the evidence was neither and the

23   ALJ was able to make findings as to the weight given Dr. Adams' opinions and plaintiff's

24   residual functional capacity.  As to Dr. Adams' April 2005 and April 2006 opinions, which are

25   discussed in detail above, it is clear that they were inconsistent, contradicted by the evidence as a

26   whole, and not supported by objective findings.  As to Dr. Adams earlier opinions, the ALJ

1    accepted them and incorporated them in her residual functional capacity finding.  Moreover, they

2    were consistent with the opinion of Dr. Sommer who opined in November 2002 that plaintiff

3    should avoid heavy lifting, repetitive movements, and forceful motions with the upper

4    extremities.

5                   3.      Reliance on ALJ's Own Medical Opinions

6            Again, while plaintiff suggests this argument in her summary of arguments and

7    headings, she provides no supporting points and authorities.  Upon review of the ALJ's opinion,

8    the court does not find that she in any way substituted her own medical opinions.  Rather, she

9    discussed the various medical opinions of record and provided reasons for either accepting or

10   rejecting them.  While the ALJ did in fact reach her own conclusion as to the residual functional

11   capacity indicated by the accepted medical opinions, such a determination is the sole

12   responsibility of the ALJ, as the defendant notes.  See Vertigan v. Halter, 260 F.3d 1044, 1049

13   (9th Cir. 2001).

14   **B.      Plaintiff's Credibility**

15           The Commissioner determines whether a disability applicant is credible, and the

16   court defers to the Commissioner's discretion if the Commissioner used the proper process and

17   provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

18   credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

19   F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

20   821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

21   and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

22   evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

23   credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

24   1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

25   and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

26   / / /

1        If there is objective medical evidence of an underlying impairment, the

2   Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

3   because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

4   341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

5               The claimant need not produce objective medical evidence of the
            [symptom] itself, or the severity thereof.  Nor must the claimant produce
6           objective medical evidence of the causal relationship between the
            medically determinable impairment and the symptom.  By requiring that
7           the medical impairment "could reasonably be expected to produce" pain or
            another symptom, the Cotton test requires only that the causal relationship
8           be a reasonable inference, not a medically proven phenomenon.

9           80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
            Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).
10

11  The Commissioner may, however, consider the nature of the symptoms alleged, including

12  aggravating factors, medication, treatment, and functional restrictions.  See Bunnell, 947 F.2d at

13  345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's

14  reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony;

15  (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed

16  course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and

17  third-party testimony about the nature, severity, and effect of symptoms.  See Smolen, 80 F.3d at

18  1284 (citations omitted).  If the claimant testifies as to symptoms greater than would normally be

19  produced by a given impairment, the ALJ may disbelieve that testimony provided specific

20  findings are made.  See Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683,

21  687 (9th Cir. 1989)).

22       Plaintiff asserts the ALJ erred by rejecting her testimony as not credible "without

23  making specific findings stating clear and convincing reasons for doing so."  As to plaintiff's

24  credibility, the ALJ stated:

25              The claimant alleges that she is disabled due to constant neck, back, and
            shoulder pain, carpal tunnel syndrome, hepatitis B, high blood pressure,
26          TMJ, and depression (1E/2; 8E/7).  She claims that virtually any activity

28

will increase the severity of her muscle spasms and pain (4E/2; 3F/6). Mentally, she states she has difficulty with memory, concentration, and focus (4E/2; 8E/6).

The claimant reported in November 2002 that she could not lift more than five pounds (3F/6). She reported in June 2003 that she could only work about 15 to 18 minutes before she would need to stop and lie down (7F/41).

The claimant testified at the hearing that she can lift less than a gallon of milk. She stated that she can lift a piece of paper only occasionally, as she cannot do repetitive movements. She testified that she could sit for 30 minutes, but would need to lie down for 30 minutes before returning to sitting again. The claimant indicates that on bad days she remains in bed all day.

After considering the evidence of record, I find that the claimant's medically determinable impairments could not reasonably be expected to produce the alleged symptoms, and that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible.

The ALJ then added the following analysis of the record:

The record shows that the claimant's condition improved significantly with treatment. Her pain is well controlled on medication (7F/75, 78, 81, 104, 113, 118; 15F/33; 16F/4). Physical therapy and a TENS unit also improved her symptoms (7F/111-113).

Furthermore, it is noted that the claimant initially refused physical therapy following the accident, and was not consistent with wearing her cervical collar (7F/118, 122). She repeatedly refused epidural steroid injections (15F/22, 40, 65, 71). In addition, on one occasion during which the claimant sought to refill her pain medications early, her primary care provider instead offered her a referral to a chiropractor at the clinic (15F/60). He explained:

> [t]he patient was offered a chiropractic referral for today, and [the chiropractor] was available to see her, but she declined stating that she has a lot of Christmas shopping to do today. . . . It was suggested that the patient try to do something besides take pills to alleviate her neck pain.

(15F/60, *see also* 7F/22). The fact that the claimant complains of debilitating back pain but does decline suggested treatment to improve her condition suggests that it is not as severe as she alleges.

Moreover, the claimant's reported activities are not consistent with [plaintiff's statements of disabling symptoms]. She is independent with her self-care (4E/1; 9E/5). While she states she relies on her family for help, she reported that she does some household chores such as cleaning,

1   shopping, and cooking (4E/1-5; 5E/4; 9E/5; 5F/3). She also made a
    conflicting report that she cannot do grocery shopping, carry any
2   purchases, or do any housecleaning (3F/6). She attends church weekly,
    and socializes with a few good friends (4E/3; 5E/5; 5F/3). Medical
3   records from March 2003 document the claimant's report that she was
    working on the computer up to seven hours per day, seven days per week
4   (7F/53, 58). This is totally inconsistent with her testimony of only
    occasionally being able to lift a piece of paper and do no repetitive
5   movements.

6   Finally, it is noted that the claimant actually worked after the date she
    alleges she became disabled and unable to work. She in fact returned to
7   work as a janitor, which she testified lasted for a couple of weeks
    (7F/113). The claimant's reported 41 percent disability rating through
8   workers' compensation does not support a conclusion that she is unable to
    perform any work.

9

10  Citing <u>Vertigan</u>, 260 F.3d at 1050, <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989), and

11  <u>Benecke v. Barnhart</u>, 379 F.3d 587, 594 (9th Cir. 2004), plaintiff argues that her "efforts to do

12  what daily activities her pain condition permitted should not detract from her credibility as to her

13  overall disability." In particular, regarding the ALJ's observation that plaintiff reported in 2003

14  that she was doing extensive work on the computer, plaintiff adds: "The ALJ omitted the end of

15  the sentence [of the medical note] (". . . and has had increasing pain to the above-mentioned

16  areas." Plaintiff concludes that her "attempt at increased productive activity was short-lived."

17  As revealed by the above excerpts from the ALJ's decision, the ALJ provided the

18  following reasons for rejecting plaintiff's testimony as not credible: (1) plaintiff's pain was well

19  controlled with medication; (2) plaintiff refused recommended treatment; (3) plaintiff provided

20  contradictory statements concerning her abilities; (4) plaintiff's testimony of disabling pain is

21  inconsistent with her activities of daily living; and (5) plaintiff worked after the alleged onset

22  date of disability. The court finds that these are legally sufficient reasons. The court also finds

23  that the ALJ set forth specific findings supporting her credibility determination. The question is

24  whether the ALJ's analysis is supported by substantial evidence in the record as a whole. For the

25  reasons discussed below, the court finds that it is.

26  / / /

First, the evidence supports the ALJ's finding that plaintiff did in fact refuse treatment alternatives to pain pills.  On September 9, 2004, plaintiff refused Dr. Adams' suggestions of treatment options such as epidural injections, chiropractic car, and/or physical therapy.  See Ex. 7F.  Dr. Adams offered plaintiff a chiropractic referral in December 2004 which plaintiff refused because she had a lot of Christmas shopping to do.  See Ex. 15F; CAR 569.  She also refused Dr. Adams' suggestions on two separate occasions in March 2003 to attend physical therapy and/or chiropractic care.  See Ex. 7F; CAR 300, 331.  Additionally, the record reflects that plaintiff declined Dr. Adams' suggestion in October 2005 that she seek epidural injections and/or physical therapy for pain management.  See Ex. 15F; CAR 531.  Plaintiff consistently opted for medication only over any other options, such as physical therapy and/or chiropractic care.[5]

Second, the ALJ noted plaintiffs' report to her treating doctor in March 2003 that she was using the computer for extended periods of time.  While plaintiff is correct that the doctor also stated in his notes that plaintiff "has had increasing pain to the above-mentioned areas" as a result, what plaintiff does not mention is that, as part of the doctor's treatment plan, he provided plaintiff with wrist splints and coached her on proper posture and hand positioning while using the keyboard.  See Ex. 7F; CAR 331.  This suggests that plaintiff intended to continue her computer use which is inconsistent with her statements of debilitating pain and an inability to do repetitive movements.

Third, concerning plaintiff's activities of daily living, in November 2002 plaintiff reported to Dr. Sommer that "she cannot do any grocery shopping, carry any purchases, or do any housecleaning, and she is really quite restricted."  See Ex 3F; CAR 217.  However, she reported on a Daily Activities Questionnaire completed in January 2004 that she goes shopping and runs

---

[5]    It appears that plaintiff also self-medicated by using marijuana.  Dr. Adams' treatment notes from March 24, 2005, indicate that, by that time, plaintiff was using marijuana regularly.

1   errands two to three times a week with assistance from her family.  See Ex. 4E; CAR 121.

2   Moreover, as discussed above, Dr. Adams offered plaintiff a chiropractic referral in December

3   2004, which plaintiff refused because she had a lot of Christmas shopping to do.  See Ex. 15F;

4   CAR 569.  Thus, by plaintiff's own statement to her treating physician, in late 2004 she was able

5   to do "a lot" of shopping.  Plaintiff's statements in 2004 are either consistent with her November

6   2002 statement because plaintiff's condition improved over time, which plaintiff denies, or they

7   are inconsistent because plaintiff's condition has remained the same.  Either way, these

8   statements tend to undermine plaintiff's credibility.

9          Fourth, as the ALJ noted, plaintiff's problems either improved or were well

10  managed with medication.  For example, in August 2001 plaintiff told Dr. Adams that she was

11  "getting good pain relief with the TENS unit and electrical stimulation."  See Ex. 7F; CAR 391.

12  In September 2001 plaintiff reported that physical therapy was providing pain relief.  See id. at

13  390.  In November 2001 Dr. Adams noted that plaintiff "gets good pain relief with the Vicodin

14  and Robaxin."  See id. at 382.  In June 2002 Dr. Adams noted that, while plaintiff still "gets a bit

15  of neck pain," it is "fairly easily controlled with pain medications and it is nothing of the

16  previous radicular nature."  See id. at 359.  In August 2002 Dr. Adams reported "[r]esolved

17  carpal tunnel syndrome" due to successful surgery.  See id. at 353.  Dr. Adams also reported in

18  August 2002 that plaintiff's osteoarthritis symptoms in her back, hip, and joints were "well

19  controlled on her current regimen" of Lorcet and Soma, which plaintiff said "give her fairly good

20  relief."[6]  See id.   These are just a few further examples showing that plaintiff's pain symptoms

21  either improved or were controlled with medication and/or current treatment, which contradicts

22  her statements of disabling pain.

23  
24          [6]     Dr. Adams' statement is supported by plaintiff's continued refusal of other
    modalities of pain management, such as epidural injections and/or chiropractic care.  The refusal
25  of other recommended treatment options indicates that plaintiff did not feel that her pain
    symptoms warranted anything other than pain pills.  Additionally, Dr. Adams' treatment notes
26  from 2006 reflect that, when plaintiff ran out of her medication, her pain increased.  See Ex. 15F;
    CAR 514.  This also suggests that medication controls plaintiff's pain symptoms.

1       And fifth, plaintiff reported to Dr. Adams in August 2001 that she had returned to

2   work on modified duty and experienced soreness over the first two days.  See Ex. 7F; CAR 390.

3   In September 2001 plaintiff stated that she was working and performing all of her work tasks in a

4   three-and-a-half-hour period at the end of which she was sore.  See id.   However, plaintiff

5   reported to Dr. Daigle in 2004 that she has not worked since her work injury in June 2001. These

6   statements to her doctors are obviously inconsistent.  In particular, her statements to Dr. Adams

7   that she worked in August and September 2001 are inconsistent with her testimony that she

8   became totally disabled and unable to work in July 2001.

9       Finally, turning to plaintiff's argument under Vertigan, Fair, and Benecke that her

10  attempts to do what her pain would allow were short-lived and should not detract from her

11  credibility, the court notes that, in addition to working for at least two months in the summer of

12  2001 (after she alleged the onset of total disability), plaintiff's pain was under control with

13  medication and therapy in late 2001 and through at least the summer of 2002, and plaintiff was

14  using the computer for extended periods of time in 2003.  Thus, it is not at all clear that

15  plaintiff's attempt to do what her pain would allow was short-lived.  To the contrary, it seems

16  that plaintiff's pain was under control and that she could do quite a bit more than her statements

17  of totally disabling pain would suggest.  Plaintiff's citation to Vertigan, Fair, and Benecke is not

18  convincing.

19  **C.    Vocational Expert Testimony**

20      Hypothetical questions posed to a vocational expert must set out all the

21  substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

22  Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

23  limitations, the expert's testimony as to jobs in the national economy the claimant can perform

24  has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

25  the ALJ may pose to the expert a range of hypothetical questions, based on alternate

26  interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

1   determination must be supported by substantial evidence in the record as a whole.  See Embrey v.

2   Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

3               Plaintiff argues that the ALJ erroneously:  (1) relied on the vocational expert's

4   answers to questions which did not accurately reflect her residual functional capacity; and

5   (2) rejected answers to questions that did.  Plaintiff does not argue that the ALJ erred by failing

6   to include any limitations associated with depression and anxiety.  Plaintiff's argument, in its

7   entirety, is as follows:

8               . . . [W]hen asked if the jobs identified in response to the ALJ's
            hypothetical allowed an individual to lie down every two hours for a half-
9           hour, the vocational expert testified "no," a person with such restriction
            would not be working full-time.  That is, no gainful employment would be
10          available to a person with that limitation.  When asked if the person
            missed up to four days per month due to absences could such a person
11          maintain any competitive work in the job force, the vocational expert
            answered, "No." (Tr. 648).
12              When this vocational evidence is considered with the improperly
            rejected medical opinion of Dr. Adams and Plaintiff's improperly rejected
13          testimony, the vocational expert's testimony shows the ALJ/Commissioner
            has not carried its burden at Step 5 of proving jobs existing in significant
14          numbers in the economy Plaintiff could perform, thereby compelling a
            finding of "disabled."
15

16   In response to hypothetical questions reflecting the ALJ's assessment of plaintiff's residual

17   functional capacity, the vocational expert testified that plaintiff could perform jobs which existed

18   in significant numbers in the national economy.  Because, as discussed above, the ALJ's residual

19   functional capacity assessment is supported by substantial evidence, plaintiff's arguments

20   concerning the hypothetical questions posed to the vocational expert necessarily fail.

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1.    Plaintiff's motion for summary judgment (Docs. 12 and 13) is denied;

2.    Defendant's cross-motion for summary judgment (Doc. 18) is granted; and

3.    The Clerk of the Court is directed to enter judgment and close this file.

DATED: November 21, 2008

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE